**LUNA COHEN AND JONATHAN a/k/a JOHN ERIKSON, Plaintiffs**

v.

**DOROTHY RAEDLER, Defendant**

Civil No. 1340–1978

Territorial Court of the Virgin Islands

Div. of St. Croix at Christiansted

May 13, 1980

---

FRANK PADILLA, ESQ., Frederiksted, St. Croix, V.I., *for plaintiffs*

ALBERT A. SHEEN, ESQ., Christiansted, St. Croix, V.I., *for defendant*

SILVERLIGHT, *Judge*

## MEMORANDUM OPINION

Luna Cohen and John Erickson commenced this action against Dorothy Raedler, a director of the St. Croix School of the Arts, Inc. (hereafter "School"), seeking damages for libel and slander. The School, without benefit of a formal intervention, filed against the plaintiffs a pleading setting forth a claim for damages for supplies and materials belonging to the School allegedly used by plaintiffs without consent.[1] The plaintiffs responded by filing pleadings

---

[1] The School's pleading, (actually intervenor's complaint) inaccurately styled "counterclaim", was filed without first moving to intervene. Although its claim for damages was not properly pleaded, it was not objected to by the plaintiffs and was tried by the implied consent of the parties. Therefore, pursuant to Rule 15(b) Fed. R. Civ. P., I have treated it in all respects as if it had been properly raised

against the School seeking to hold it liable for the alleged communications of Raedler.

## THE FACTS

In July of 1977, shortly after graduating from Rutgers University, Cohen entered the employ of the School as a VISTA Volunteer following an interview in New York. Upon beginning work as an art instructor, she was furnished a cottage on the School's premises in which to live and was assigned a studio in which to work. She was required to work twenty-five hours per week, her primary duty being to teach adult and children's art classes. When she did not have twenty-five hours of classes scheduled in any week, she was to make up the balance of time by producing ceramics to be sold in local shops, the proceeds to go to the School. She was authorized to use the studio in her non-working hours to make products for personal use or sale but was to notify Raedler if she used certain equipment in the studio so that she could be charged for electricity.

In January of 1978, Erickson began occupying the cottage with Cohen. He was also to be charged for electricity; he agreed to pay the School $25.00 per month for electricity consumed by his electric saw. Since the cottage was in need of furniture, he and Raedler entered into an agreement whereby he would construct a couch and table for the School to be used by him and Cohen while living in the cottage and Raedler would provide money for the necessary supplies. Pursuant to this agreement, Raedler gave him $100.00 and he purchased supplies and constructed the furniture.

On Sunday, April 23, 1978, without giving notice, Cohen and Erickson moved from the School and Cohen discontinued teaching her classes. Raedler was not on the island on April 23, but upon her return on April 28, 1978, Roberto Rivera, the School's maintenance man, reported to her that the plaintiffs had left the School and that his inspection of the studio the day after their departure revealed that everything was missing. Raedler inspected the studio herself and found that it contained none of Cohen's work and was empty except for a kick wheel used in ceramics and two kilns.[2] Undisclosed staff members then informed her that during the month prior to their departure the plaintiffs had worked nights in the stu-

---

in the pleadings. Since, upon timely application, the School would have been granted a permissive intervention under Rule 24(b), this procedural irregularity has not affected the ultimate outcome of the case.

[2] Kilns are gas or electric ovens used to fire or petrify ceramics.

dio using school materials. This information induced Raedler to believe that the plaintiffs had been stockpiling ceramics made with the School's materials.

Approximately two weeks after the plaintiffs' departure, Raedler sent a letter to Cohen dated May 5, 1978, which stated that the School had determined that she had misappropriated funds given to her for the purpose of buying materials for the School and had used the School's materials to craft pottery which she had sold and was selling for personal profit. It also stated that the School had determined that Erickson had left furniture built with lumber valued at considerably less than the $100.00 he was given and that he owed the School $25.00 for utilities for the month of April, 1978. The letter advised that if Cohen did not make financial restitution within ten (10) days from receipt of the letter, the School would take legal action and would notify Rutgers University of the details surrounding her departure from the School with a request that such details be incorporated into her permanent school records.

When shortly after receiving the letter the plaintiffs encountered Raedler, Cohen refused to discuss with her the charges made in the letter. Soon thereafter, Raedler spoke to Gordon Powell and Celeste Caldwell, shop owners who sell locally made crafts. She asked Powell of the "Sun and Moon" shop if he had recently purchased ceramics from the plaintiffs. When he answered that he had and asked the reason for her inquiry, she replied, "Well, because I have strong reason to believe that the ceramics were produced with materials which belong to the St. Croix School of the Arts and were produced in the St. Croix School of the Arts' studio, using their equipment, without permission of the School."[3] When Caldwell of "Heritage House" contacted her by phone, Raedler repeated the substance of this statement.[4] These conversations are the bases for the slander action.

Raedler then sent a second letter to Cohen dated May 22, 1978, which stated that since Cohen had not complied with her demand for financial restitution, she was going to contact Rutgers as indicated so that Cohen would be unable to use her college for reference purposes. This letter also warned that legal action would be taken if Cohen did not make financial restitution within ten (10) days of its receipt.

The charge of libel arises from the letter Raedler then sent to the

---

[3] Testimony of D. Raedler, Tr. I at 11.

[4] Testimony of D. Raedler, Tr. I at 12.

placement office of Douglass College of Rutgers University dated May 23, 1978, which read:

Gentlemen:

Since Rutgers University is a prestigious institution whose graduates are well-regarded in the business world, we feel that you will want to be advised of a situation regarding one of your graduates. We are hopeful that this information in your files will prevent other potential employers of Luna Cohen from having the same unfortunate experience that we did.

Luna Cohen graduated from Douglass College with a Bachelor of Arts Degree in Studio Arts, in January, 1977. At the suggestion of another Rutgers graduate who was employed at our school, Luna applied for a position as a Visual Arts instructor under the federally funded Vista Volunteer program. She was engaged by us after Vista approval and arrived in the Virgin Islands on July 2nd.

She was provided with free housing by our School and was given permission to have a boyfriend John Erickson reside with her with the understanding that he would pay a nominal monthly utility charge.

Without our permission or knowledge Ms. Cohen and Mr. Erickson have been stockpiling ceramics made in our studio with our equipment and materials in spite of the fact that Ms. Cohen was told specifically that Erickson was not permitted in the studio.

The ceramics have been peddled around the Island of St. Croix by Erickson and represented as the property of Luna Cohen.

We are attaching a copy of a letter we wrote to Ms. Cohen on May 5th and another letter written to the District Director of Vista Program. These will supply further details.

We have consulted with our attorney who advises us that a charge of embezzlement can and should be made against both Cohen and Erickson since we have received no reply from her to our letter.

Please feel free to refer this information to any departments or any individuals at the college that might be contacted for references.

Thank you for giving this information your attention.

Sincerely,

/s/ Dorothy F. Raedler, Director

Rutgers returned the letter, along with the copies of the correspondence which had been enclosed with it, explaining that if the documents were placed in Cohen's file, she would have a right to review them.[5] Rutgers further stated that if, nevertheless, it was Raedler's wish, the letters would be placed in Cohen's school records. Raedler returned the documents with instructions that they be put in Cohen's file.

## I. THE DEFAMATION CLAIMS

■ By virtue of 1 V.I.C. § 4 which make the A.L.I. Restatements the rules of decision in the Virgin Islands absent local law to the contrary, the Restatement (Second) of Torts (herein Restatement) provides the law applicable to this case. The elements of a cause of action for defamation are set forth in Section 558 of the Restatement:

(a) a false and defamatory statement concerning another;

(b) an unprivileged publication to a third party;

(c) fault amounting at least to negligence on the part of the publisher; and

(d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication.

My principal effort herein is to apply these elements to the evidence presented.

### A. Nature of Statements

■ Words are defamatory if they tend "so to harm the reputation of another as to lower him in the estimation of community or to deter third persons from associating or dealing with him." Restatement, § 559. Words may be categorized into those that cannot possibly have a defamatory meaning; those that are ambiguous, that is, capable of conveying a defamatory meaning as well as an innocent one; and those that are defamatory on their face. If the words are ambiguous, the plaintiff must prove that they are capable of the defamatory meaning ascribed to them and that they were understood by the recipient in their defamatory sense. When, however, the plaintiff proves the publication of words that are defamatory on their face, the burden is on the defendant to come forward with evidence to make it doubtful that the recipient so understood them. Id. § 613, comment c.

---

[5] I deem this to describe a due process right which Cohen would have as a condition precedent to the letter being placed in her file.

■ Accusations in the three communications in question which charge the plaintiffs with using the School's materials to make their own products unambiguously imputed dishonest conduct to the plaintiffs. The imputation of such conduct would necessarily tend to harm the plaintiffs' reputation and to deter third persons from dealing with them. Accordingly, I find that portion of each publication is defamatory on its face. It being so established and the defendants not having come forward with evidence of a contrary understanding by the recipients, it was unnecessary for the plaintiffs to prove that the recipients understood the defamatory meaning.

■ I must next address the truth or falsity of the publications. Under the common law, it has been consistently held that defamatory statements will be presumed false and that the defendant bears the burden of proving their truth as a defense. Id. § 518A, comment b. With this burden in mind, I turn to the evidence adduced by the defendants to establish that the plaintiffs, without consent, used the School's materials to make ceramics to sell for personal gain.[6]

First, the defendants offer evidence of a shortage of ceramic supplies experienced by the School during Cohen's employment. From the alleged shortage, along with the undisputed fact that the plaintiffs sold ceramics for personal profit while living at the School and subsequent to their departure, the defendants would have me infer that the plaintiffs sold ceramics made with the School's materials.

As an initial matter, it is necessary to describe the procedure used in ceramics as testified to at the trial. A chunk of clay is kneaded to get the air out, shaped, allowed to dry, and then fired or petrified in a kiln. If a glazed surface is desired the object is allowed to cool and then fired again with a glaze on it. Before the object has been fired, it is in a malleable state and the clay can be recycled, that is, kneaded and shaped again after putting it back in water, if necessary, depending upon how dry it has become.

To support their allegations of a shortage, the defendants introduced the deposition of Dena Glenn, a student in one of Cohen's

[6] To constitute the defense of truth, a defendant must demonstrate the truth of that portion of the statement which alone makes it defamatory. Picard v. Brennan, 307 A.2d 833 (Me. 1973). Here, I cannot conclude that accusations in the publications which charge the plaintiffs with the unauthorized use of the School's facilities are defamatory on their face and the plaintiffs have not come forward with proof that they were understood in a defamatory sense. Accordingly, these accusations are inoffensive details which are immaterial in determining the truth of the defamatory statements.

adult classes. It was Ms. Glenn's testimony that whereas in February and March of 1978, her class had new clay to work with, by mid or late March Cohen was giving the class recycled clay. She also testified that the supply of glaze was low in mid or late March.

Concerning the clay, Ms. Glenn's testimony did no more than establish that Cohen gave Glenn's class, an adult class, recycled clay to work with. I see nothing incriminating about this; it seems perfectly proper in light of Cohen's testimony that since adults are more adept at handling clay than children are, her usual practice was to give adult classes clay that had been worked once and thrown back in the stock and to give the children's classes new clay to work with.

Cohen's testimony, however, establishes that a shortage occurred during her employment. There is no evidence, however, that it was caused by the plaintiffs. To the contrary, the evidence shows that it was caused by the conditions that existed at the School. It is undisputed that one of the School's kilns was not working and the other was not working properly. Cohen explained that since her students were unable to fire and glaze their pottery as it was made, she had to continue giving them clay to design new pieces and was therefore using clay at a rapid pace toward the end of her employment.

Concerning glaze, although Ms. Glenn's testimony indicates a shortage in March, that is all it indicates. There was no attempt to show that the shortage was unnatural. The inference can and should be drawn that the rate of consumption was lower than usual because the kilns were not in good working order. No evidence, however, was presented as to the amount of glaze the School had and used from its purchases prior to March 1978. Accordingly, I cannot conclude that the stock of glaze was low for any reason other than the consumption which occurred in the course of operating the School.

Thus, while the evidence establishes that a shortage of clay and glaze did occur during Cohen's employment, there is little or no evidence tracing its origin to the plaintiffs. The fact that the plaintiffs did sell ceramics for personal profit during and after Cohen's employment, however, might be incriminating if left unexplained.

It was the plaintiffs' testimony that all products they sold for personal profit had been made with their own materials. During the period of January to April of 1978, they testified that they each made only one sale; Erickson sold ceramics to "Sun and Moon" and Cohen sold ceramics to "Heritage House." To establish that they had sufficient materials of their own from which to make these prod-

ucts, Erickson testified that he had an unspecified quantity of clay when he moved onto the School's property in January and that he and Cohen purchased fifty pounds on February 9, 1978, from Conrad's Ceramics, for which he produced a receipt.[7] Fifty pounds of clay, he said would yield thirty to forty pieces in the small to medium size range. From the fifty pound purchase he made "less than a dozen" small pieces for "Sun and Moon" and an unspecified number of pieces which were not immediately sold. Although the testimony was somewhat confusing as to whether the six objects Cohen made for "Heritage House" came from the fifty pound purchase or a separate purchase for which there was no receipt it is clear that the plaintiffs had enough clay from which to make this small number of items. The glaze for each of these sales, Erickson said, came from purchases from Conrad's Ceramics and from a shop in Puerto Rico, for which he had not kept receipts.

Following their departure from the School, the plaintiffs sold additional ceramic pieces. Again they testified that they had used their own materials. As partial support for their testimony, they produced a receipt from Conrad's Ceramics for the purchase of twenty-five pounds of clay on April 21, 1978.

The plaintiffs' testimony is sufficient to rebut any negative inferences which might be drawn from the mere fact that they sold ceramics. Thus, the defendants have failed to establish by a preponderance of the evidence that the plaintiffs created a shortage of supplies at the School by producing ceramics with the School's materials to sell for personal profit.

Next, the defendants offer evidence of the disappearance simultaneous with the plaintiffs' departure from the School, of ten to fifteen unfired ceramic pieces that Cohen had made as part of her twenty-five hour work week requirement. The uncontroverted testimony is that they were on a table in the studio prior to the plaintiffs' departure.

Roberto Rivera, the School's maintenance man, testified that when he inspected the studio the day after the plaintiffs left, he found "nothing." Upon this testimony, if it were all that was presented, it might be inferred that the plaintiffs took the unfinished pieces with them when they left the School. The plaintiffs, however, testified that the clay from these items had been recycled and left in the studio.

---

[7] Plaintiffs' exhibit 4 indicates that one hundred pounds of clay were purchased for the price of $16.00. Erickson testified, however, that while the price was correct, only fifty pounds of clay were purchased.

Cohen explained that she did not feel obligated to leave her unfinished products for the School. Therefore, upon leaving she simply broke up the unfired pieces and returned them to the School's stock. Her testimony was corroborated by Erickson. The inquiry focuses upon whether the clay from which these pieces had been made was in the recycling bucket or drum following the plaintiffs' departure.

On direct examination, when asked if he found "any broken pieces of ceramics or pottery," Rivera stated that he did not. The distinction between broken pieces of fired pottery and broken pieces of unfired pottery, however, cannot be overlooked. Since there is no evidence to indicate that Rivera was familiar with the practice of breaking up unfired pieces of clay for recycling, this testimony is not probative of the question whether clay representing broken pieces of unfired pottery was left in the studio.

Although Rivera also stated during direct examination that "nothing" remained in the studio following the plaintiffs' departure, his broadly stated testimony was seriously eroded on cross-examination:[8]

> Q Now, the next morning—your testimony is that the next morning everything was gone, even the shelves with the children's goods?
> A Everything that was on top of the table.
> Q Oh, just on the table?
> A The material that was already made—
> Q Where were these materials already made?
> A —and there were tools—on top of the table.
> Q So only things on top of the table were missing?
> A Well, tools were missing; all of the materials that was already made.
> Q Were these materials already made on the table?
> A Yes.
> Q How about the 50-gallon drum?
> A What kind of drum?
> Q The drum they put the clay in.
> A The garbage drum.
> Q Yes.
> A It was in the corner.
> Q Did it have anything in it?
> A Papers.

----

[8] Tr. II at 69–70.

In my opinion, this testimony indicates that upon observing that everything was missing from the table, Rivera jumped to the conclusion that "nothing" remained in the studio when, in fact, the studio at least contained the children's ceramics and the recycling bucket or drum. Having concluded that "nothing" remained or, in other words, that "nothing" of any importance remained, it is doubtful that he inspected the recycling drum. Concerning the drum, he testified that papers were in it, but that is all he said. He did not say he inspected it to see if there was clay under the papers. Thus, his testimony that everything was missing from the studio does not establish that the clay was not in the recycling bucket.

The defendants put on other testimony of this question. Mary St. Aime, a school employee, testified that her inspection of the studio revealed that "the studio was clean" and that it contained "nothing." I give little weight, however, to this testimony since her inspection was made on Tuesday, two days after the plaintiffs' departure. It is noted that during part, at least, of the two day interval the studio was unlocked. It is also noted that this testimony contradicted the testimony of another defense witness, Dena Glenn, that on Tuesday morning there was a small amount of clay in the studio. Similarly, I do not credit Raedler's testimony concerning the condition of the studio since her inspection occurred five days after the plaintiffs left.

In short, the defendants have failed to establish by a preponderance of the evidence that the plaintiffs took with them the ten to fifteen unfinished items Cohen made for the School.

Finally, the defendants contend that the evidence establishes that clay and glaze disappeared from the studio simultaneously with the plaintiffs' departure. Raedler testified that between the 4th and 11th of April, 1978, the School purchased 150 pounds of clay and $46.00 of glaze. She also stated that the glaze should have lasted several months. There was no testimony, however, as to whether all of these materials were entrusted to Cohen for her use and the use of her students or as to how much of these materials were in the studio prior to the plaintiffs' departure. Thus, as to the glaze, while I agree with the defendants that the evidence establishes that there was none in the studio following the plaintiffs' departure, I cannot infer from that that it was taken by the plaintiffs. As to the clay, it bears repeating that I cannot agree that the evidence establishes that there was none remaining in the recycling drum. Further, even if the entire 150 pounds of clay had been entrusted to Cohen and even if little or no clay was in the studio after the plaintiffs left,

59

since Cohen testified that toward the end of her employment her classes were using approximately 50 pounds of clay per week, it could reasonably be inferred that the clay was consumed by the classes.

▮ In sum, the preponderance of the evidence shows that the defamatory statements were false, that is, that the plaintiffs did not use the School's materials without consent to produce ceramics to sell for personal gain.

## B. Privilege

▮ The defendants contend that they were conditionally privileged to publish the defamatory matter. Under the rule stated in Section 593 of the Restatement, one is not liable for a publication if the matter is published upon an occasion that makes it conditionally privileged and the privilege is not abused.

▮ Raedler testified that she sent the letter to Rutgers because she felt it was her moral and legal duty to make any potential employer of Cohen aware of the experience the School had had with her.[9] Statements properly published to protect the interests of third persons are qualifiedly privileged under § 595 of the Restatement which provides:

> An occasion makes a publication conditionally privileged if the circumstances induce a correct or reasonable belief that
> (a) there is information that affects a sufficiently important interest of the recipient or a third person, and
> (b) the recipient is one to whom the publisher is under a legal duty to publish the defamatory matter or is a person to whom its publication is otherwise within the generally accepted standards of decent conduct.

Although, in his argument for a directed verdict made at the close of the plaintiff's case, the attorney for the defendants placed reliance upon § 594 of the Restatement rather than § 595. I attribute this to inadvertence. Section 594 reads:

> An occasion makes a publication conditionally privileged if the circumstances induce a correct or reasonable belief that
> (a) there is information that affects a sufficiently important interest of the publisher, and
> (b) the recipient's knowledge of the defamatory matter will be of service in the lawful protection of the interest.

[9] Transcript of July 31, 1979 at 19, 20.

The problem with relying on § 594, insofar as the statements to Rutgers are concerned, is that it was Raedler's specific testimony that she sent the letter to Rutgers for the purpose of furnishing information to Cohen's prospective employers. Since the particular interests she was seeking to protect by publishing the defamatory matter were those of third persons, the conditional privilege at issue must necessarily be that of § 595. Therefore, I do not deem it appropriate to evaluate the evidence in terms of § 594 which gives a conditional privilege where the publisher acts to protect an interest of his own.

▮ Under this section, it is generally held that statements by a former employer to a prospective employer concerning the character or conduct of an employee are qualifiedly privileged since they are of service in protecting the prospective employer's interest in hiring honest and efficient personnel. Restatement, § 595, comment i; Calero v. Del Chemical Corp., 228 N.W.2d 737 (Wis. 1975); Zuschek v. Whitmoyer Laboratories, Inc., 430 F. Supp. 1163 (D. Pa. 1977).

▮ It is not necessary that the employee evaluation be published directly to the prospective employer. It may be communicated to any person whose knowledge of the defamatory matter is likely to be of service in the protection of the interest. Restatement, § 595, comment e.

▮ Since Rutgers' knowledge of Cohen's conduct while employed by the School is likely to aid prospective employers in deciding whether or not to hire her, Rutgers is an appropriate recipient of the information. Accordingly, a conditional privilege attached to statements concerning Cohen in Raedler's letter.

Statements concerning Erickson which were in the letter, of course, were not similarly privileged. He was not a former employee of the School, nor did he have any connection with Rutgers. There being no cogent contention that these statements fell within any of the qualified privileges set forth in the Restatement, I hold that such a privilege did not attach to the defamatory written statements concerning him.

▮ I turn now to the defendant's contention that Raedler's oral statements to Powell and Caldwell were qualifiedly privileged under § 594 of the Restatement.[10] As I understand their argument,

[10] See supra.

they claim that since the School is a non-profit organization partially dependent upon income generated by the sale of crafts in local shops, its interest in maintaining local outlets for the work of its teachers is sufficiently important to allow it to publish information which will protect its market by discouraging trade with crafts people not employed by the School. I disagree since the publisher's interest in keeping down competition is not one that is entitled to protection. Id. 594, comment g.

Raedler's statements to Powell and Caldwell were, however, conditionally privileged under another section of the Restatement. Raedler testified that art instructors employed by the School customarily sold crafts to Powell or placed crafts in his shop on consignment, the proceeds of which went to the School. She stated that although the School had not yet used Caldwell's shop as an outlet for crafts, it intended to make arrangements in order to do so in the future. It was her testimony that she felt it was her moral and legal duty to put these store owners who sell locally made crafts on notice that the plaintiffs were attempting to sell ceramics which they had made with materials that did not belong to them.[11]

Statements published to one who has a common interest with the publisher are qualifiedly privileged under § 596 of the Restatement, which reads:

> An occasion makes a publication conditionally privileged if the circumstances lead any one of several persons having a common interest in a particular subject matter correctly or reasonably to believe that there is information that another sharing the common interest is entitled to know.

The rule of § 596 is grounded on the fact that one is entitled to hear from his associates what is being done in a matter in which he has an interest in common with them. This interest in which their common affairs entitles him to information as to how they are conducted, or to information that affects the common interest, even though he is not personally concerned with the information. Id. § 596, comment c.

Under the rule of this section, Raedler had a right to communicate to Powell, a customer of the School, and Caldwell, a prospective customer, not only the termination of Cohen's employment, but also the status of any crafts which Cohen and Erickson had

---

[11] Transcript of July 31, 1979 at 29.

made at the School. Cf. M. F. Patterson Dental Supply Company v. Wadley, 401 F.2d 167 (10th Cir. 1968) (employer has a right to notify customers and prospective customers of the termination of one employed as a salesman and the identity of the salesman who is to succeed the one whose employment is terminated and to inform customers of the reason for the termination).

Thus the defendants were conditionally privileged to publish the written statements concerning Cohen and the oral statements concerning both Cohen and Erickson.

 A conditional privilege, however, can be forfeited by abuse. An abuse occurs if the defendant (1) acts for any purpose other than for protecting the particular interest for which the privilege is given, Restatement, § 603; (2) knows the statements to be false or acts in reckless disregard as to the truth or falsity of the statements, Id. §§ 600–602; (3) makes excessive publication, that is, speaks defamatory words in the presence of persons whose knowledge of them is unnecessary to the protection of the interest in question, Id. § 604; or (4) publishes unprivileged matter in addition to privileged matter, Id. § 605A.

To reiterate, Raedler's oral statements are privileged only if she made them for the purpose of keeping Powell and Caldwell abreast of matters affecting the business interest they had in common with the School. Her written statements to Rutgers are privileged only if she made the statements for the purpose of providing Cohen's prospective employers with information concerning her character and conduct. The plaintiffs have introduced substantial evidence, however, that Raedler acted for an improper purpose, that is, for a purpose other than for protecting the interests for which the qualified privileges were given.

 I find it difficult to put aside the possibility that her statements to Powell and Caldwell, her letter to Rutgers, and indeed, her entire course of conduct were nothing more than rather obvious attempts to compel the plaintiffs to pay the School for materials she thought they had used. In her first letter to Cohen, she threatened to expose Cohen's alleged commission of several crimes against the School to Rutgers and to take legal action *unless financial restitution was made* within ten (10) days of receipt of the letter. When the plaintiffs did not make the restitution demanded, Raedler responded by publishing her accusations to Powell and Caldwell. She then sent a second letter to Cohen which, in substance, stated that the letter to Rutgers was going to be sent as indicated but that it

was not too late to stop the institution of legal proceedings. This, it stated, could be done by making financial restitution to the School within ten (10) days of receipt of the letter. She followed through by writing to Rutgers. The clear presumption is that Cohen could stop the course of Raedler's conduct by making restitution.

I have no doubt but that Raedler believed that her accusations were true and that the plaintiffs owed the School money. She was not justified, however, in attempting to compel them to take action, even if that action might be reasonable, to remedy the asserted wrong that prompted her conduct. Her qualified privileges did not attach for this purpose. Accordingly, I hold that she abused the conditional privileges that were given to her oral and written publications and that they were therefore forfeited. Having made this determination, I need not address the other ways, set forth above, in which a conditional privilege may be lost.

### C. Negligence

I next consider whether or not Raedler acted negligently in failing to ascertain the falsity of her publications. She admitted that she had no personal knowledge whatever as to the plaintiffs' alleged stockpiling of ceramics made with the School's materials. It was not until April 28, 1978, five days after their departure, that she, for the first time heard anything concerning the matter. With the exception of her inspection of the studio which could have revealed nothing conclusive since it was conducted five days after the plaintiffs left, during at least part of which time it had been open, Raedler did nothing but listen to the people who confided in her.

From the information Raedler received, she came up with the so-called "stockpiling" theory with which she became so enamored that she failed to investigate the facts that were in opposition to it. In spite of the seriousness of her charges, she apparently did not attempt to ascertain from her sources how they knew the information they relayed to her. In spite of the fact that she was aware of the practice of breaking up unfired pottery and putting it back into the stock, she did not investigate that possibility. In spite of the stormy relationship that existed between her and the plaintiffs, she took their refusal to speak with her as an admission of guilt rather than as an indication of their desire not to engage in a potentially heated conversation with her. In spite of the fact that the school's kilns were not working properly, she believed that the plaintiffs depleted the School's clay rather than that conditions required more clay to be used than would be normally the case. Thus, while

Raedler made an investigation of sorts, it was inadequate in turning up the relevant underlying facts. Accordingly, I find negligence on her part.

## D. Injury

Under the Restatement, the final element of a cause of action is either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication. The Restatement's formulation reflects the common law rule that certain publications are "actionable per se," that is, actionable without proof of actual injury since injury is presumed to occur from these publications.[12] The area of defamation per se has been modified by recent decisional law.

Extending the holding of the United States Supreme Court in Gertz v. Robert Welsh, 418 U.S. 323 (1974),[13] the District Court of the Virgin Islands in Maynard v. Khalil, 16 V.I. 372 (D.V.I. 1979), held that where a private defamation plaintiff is suing a non-media defendant on a private issue, not even nominal damages may be recovered in defamation per se absent proof of actual injury at least where no showing of knowledge of falsity or reckless disregard for the truth has been made.

Here, there was no showing of knowledge of falsity or reckless disregard for the truth. Thus it was incumbent on plaintiffs to prove actual injury. Gertz tells us that:

> . . . actual injury is not limited to out-of-pocket loss. Indeed, the more customary types of actual harm inflicted by defamatory falsehood include impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering.

Evaluating first the injury caused by the statements to Powell and Caldwell, the plaintiffs attempted to prove pecuniary loss. Erickson testified that because of Raedler's statements he felt that certain local shops refused to buy items he and Cohen produced. This proof does not suffice. In the absence of more concrete evidence that the alleged refusals were occasioned by Raedler's

---

[12] Slander per se and libel per se encompassed the imputation of a crime, of a loathsome disease, of unchastity to a woman, and those affecting the plaintiff in his business, trade, profession, office or calling.

[13] Gertz held that a private defamation plaintiff who established defamation by a media defendant but failed to prove either knowledge of falsity or reckless disregard for truth, could recover damages only for actual injury.

statements, I decline to draw such an inference. This I do especially since one of the shopowners who allegedly refused to deal with them, Powell, testified that Raedler's statements to him in no way affected his business dealings with the plaintiffs. The plaintiffs also attempted to show pecuniary loss through their testimony that the slanderous statements caused a general decline in sales. Both of the plaintiffs testified that they continued trying to sell, and in fact did sell, ceramics for some time after leaving the School. They stated that they had to give ceramics up because they could not make a living at it. This testimony is vague and unsatisfactory at best. Since they were not making a living solely from the sale of ceramics prior to Raedler's statements, the fact that they were unable to do so following the statements is of no consequence.

Neither of the plaintiffs proffered evidence of injury to reputation caused by the oral statements. Further, no evidence of mental suffering on Erickson's part was offered and evidence of mental suffering on the part of Cohen was slight. Cohen testified that when it was brought to her attention that Raedler had accused her of theft, she became extremely upset, feeling frustrated and helpless. Since she first learned of Raedler's accusations in the letter Raedler wrote to her, it is uncertain exactly what brought on this reaction and, thus, this proof does not suffice.

██ ██ Concerning injury caused from the letter to Rutgers, no evidence was offered showing injury of any kind to Erickson. The evidence, however, amply supports the conclusion that Cohen suffered mental anguish as a result of the libel. While she is entitled to recover damages for this injury, no evidence was presented upon which a precise monetary value can be based. Therefore, I hold that she recover nominal damages in the amount of $100.00. No other injury from the libel was shown to have been sustained by her.

### E. Summary

With respect to the cause of action for slander, I hold that the publications to Powell and Caldwell:

(1) contained false and defamatory statements concerning Cohen and Erickson; (2) although qualifiedly privileged, the privilege was forfeited by abuse since Raedler's sole purpose in publishing them was improper and unrelated to the purpose for which the privilege was given; (3) were published negligently; and (4) caused no actual injury to either of the plaintiffs. No injury having been shown, the prerequisites for recovery are not satisfied.

With respect to the letter to Rutgers, I hold that it:

(1) contained false and defamatory statements concerning Cohen and Erickson; (2) was unprivileged as to Erickson and, although qualifiedly privileged as to Cohen, the privilege was abused; (3) was published negligently; and (4) caused actual injury to only Cohen, that injury being emotional distress. Having proven the essential elements for a cause of action for libel, Cohen is entitled to nominal damages for emotional distress in the amount of $100.00.

 Such damages are to be recovered from the School since the minutes of its Board of Directors' meeting held on May 4, 1978, conclusively establish that Raedler was empowered by the Board to send the letter to Rutgers in its behalf.

## II. THE DAMAGES CLAIM

First, the School seeks damages from Cohen for conversion based on the following. On April 18, 1978, Cohen was given a check in the amount of $32.00, which was made payable to her and drawn on the School's account, with instructions to purchase art supplies. In violation of these instructions, Cohen endorsed the check and kept the money. It was her testimony that the School owed her $28.00 in commissions for pieces sold at "Heritage House" which she had made on her own time and with her own materials. Raedler acknowledged the sale to "Heritage House" but claimed that Cohen had been paid for the pottery.

 I need not determine Cohen's entitlement to payment for this sale. For a conversion to occur, it is enough that she, being authorized to make a particular use of the check,[14] made a use of it which was different and which constituted a serious violation of the School's right to control it.[15] Thus the School's indebtedness to her, if true, would be no defense to a conversion action. See Sisler v. Smith, 267 P.2d 1081 (Okl. 1953). Nor would a defense lie in her mistaken belief of entitlement to the proceeds of the check. See Restatement § 244.

---

[14] A check may be the subject of a conversion action and the amount stated on its face is prima facie evidence of its value. Tarrant American Savings Bank v. Smokeless Fuel Company, 172 So. 603 (Ala. 1937); See also Restatement § 242(1).

[15] § 228 of the Restatement provides:
"One who is authorized to make a particular use of a chattel, and uses it in a manner exceeding the authorization, is subject to liability for conversion to another whose right to control the use of the chattel is thereby seriously violated."

Accordingly, I find that Cohen is liable for conversion of the check and set damages therefore at $32.00.

 Second, the School seeks damages from the plaintiffs for the non-consensual use and/or removal of ceramic supplies. As stated previously, there is insufficient evidence upon which to find such a use of clay and glaze. The more difficult question concerns the wooden hand tools worth $1.00 a piece which were used by the ceramics classes. Cohen testified that during the School's summer program, most of the School's tools were damaged, taken or misplaced by the students. Since she could not find tools at any of the local art supply stores, when the fall program started she brought out her own tools for her classes to use. She stated that when she left, the School had approximately six tools remaining. She said she left these tools in the studio but took her own tools with her. This testimony of Cohen's establishes that the School had six tools which were used in her studio. Yet Rivera's testimony establishes that these tools were not in the studio on the morning following the plaintiffs' departure. Accordingly, I find that the plaintiffs took these tools upon their departure and set damages in the amount of $6.00, the value of the tools.

Third, the School asserts that Erickson is liable to it for converting to his own use a portion of the $100.00 given to him to purchase materials for the construction of the couch and table which were to be used in the cottage. Trojadio Vega, employed by the School as a carpenter, testified that following the plaintiffs' departure, he inspected the furniture made by Erickson which he said consisted of a table and the wooden frame of a couch which was put together with screws. He estimated that the lumber in the couch was worth $45.00.

Erickson testified that the $100.00 Raedler gave him went toward the purchase of lumber, nuts, bolts, stains, and foam rubber which totaled approximately $120.00. He said that the furniture was unfinished when he moved from the School but that he left a coffee table without a top and the frame of a couch with cushions left beside it.

While Vega's testimony estimates the value of the wood in the couch, it says nothing of the value of the wood in the table. Nor does it establish the value of the cushions and other materials, if any, which were left. Accordingly, I hold that the plaintiffs' proof fails to establish that Erickson converted to his use any of the money given to him.